UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO

----oo0oo----

ZACKERY KING, an individual,

        Plaintiff,

   v.

DARIGOLD INC.,

        Defendant.

No. 1:20-cv-00224-WBS

MEMORANDUM AND ORDER RE:
CROSS MOTIONS FOR SUMMARY
JUDGMENT & MOTIONS TO SEAL

----oo0oo----

Plaintiff Zackery King ("plaintiff") brings this action against defendant Darigold, Inc. ("Darigold"), seeking damages under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq., and the Idaho Human Rights Act ("IHRA"), Idaho Code § 67-5901, et seq., after his employment was terminated and after he was allegedly forced to undergo medical examinations which were not job-related or consistent with business necessity.

Presently before the court are Darigold's Motion for Summary Judgment (Defs.' Mot. for Summ. J. (Docket No. 34)), plaintiff's Motion for Partial Summary Judgment (Pl.'s Mot. for

1

Summ. J. (Docket No. 37)), Darigold's Motion to Seal Exhibits 2-5, 8, 10, 12-15, 17-18, 21-22 and 28 to the Declaration of Karin Jones in Support of Defendant's Motion for Summary Judgment (Def's. Mot. to Seal (Docket No. 35)), and plaintiff's Motion to Seal Exhibits D, E, and K to the Declaration of Jeremiah Hudson in Support of Plaintiff's Motion for Summary Judgment and Exhibit B to the Supplemental Declaration of Jeremiah Hudson in Support of Plaintiff's Response to Defendant's Motion for Summary Judgment.  (See Pl.'s Mot. to Seal (Docket No. 38).)[1]

I.   Factual and Procedural Background

Plaintiff began his employment at Darigold around April 16, 2010.  (Pl.'s Statement of Undisputed Facts ("Pl.'s SUF") at 1 (Docket No. 37-2).)  Approximately six months after he began working for Darigold, plaintiff became a Butter Churn Operator.  (See id. at 2.)  Darigold has only one Butter Churn Operator working per shift, and that person is responsible for operating two butter churns simultaneously and also covering for the Bulk Packer Operator during that employee's meal and rest breaks.  (Def.'s Statement of Undisputed Facts ("Def.'s SUF") at 2(b) (Docket No. 34-2).)  As part of their duties, Butter Churn Operators must be able to occasionally lift, move and/or carry 55

---

[1]    Both parties move for summary judgment on the two counts identified in plaintiff's complaint.  Plaintiff has styled his motion a Motion for Partial Summary Judgment because even if he prevailed, he would still have to prove damages.  (See Pl.'s Reply in Supp. of Mot. for Summ. J. at 4 (Docket No. 46).)  In addition, Darigold moves for summary judgment on whether it engaged in good-faith in the interactive process to identify a reasonable accommodation for the plaintiff, and accordingly, whether compensatory and punitive damages are available. (See Def.'s Mot. for Summ. J. at 16-17.)

or 60 pounds, bend, twist, and stand for twelve hours, crawl, maintain balance to safely climb a six-foot ladder, climb stairs with only one handrail, and maintain balance to walk safely on wet, slippery floors.  (Def.'s SUF at 2(b)(i)- (vi)); (see Pl.'s Resp. to Def.'s SUF at 2 (Docket No. 41).)

The essential functions of a Butter Churn Operator, as established by Darigold on April 16, 2018, are as follows:

(1) At the start of the shift, the Worker will check what customer product is being run during the shift.

(2) During operation, the Worker will monitor fat and salt levels on the computer monitor and make adjustments accordingly.

(3) Worker will take samples for PH checks on every silo change and if dictated by Bulk Packer.  This will occur in the Butter Dept. Lab.

(4) Worker will also take samples of butter to perform fat and salt tests in the Butter Dept. Lab.

(5) Worker will monitor readings on computer and make adjustments in the production flow as necessary.

(6) Worker will monitor salt levels in the salt tank and may use a long handed rod to adjust the salt in the tote bag to maintain the flow.  Worker will also contact the Warehousemen when another salt tote is needed in the salt room.  It will be loaded into the dispenser by the Warehousemen using a Forklift.  The Worker will feed the opening section into the dispenser and cut open the tote bag to initiate flow.

(7) Worker will perform Cleaning In Place ("CIP") every other day or if required by a customer before and after a product run, on the butter churn and related equipment.

(a) Worker will dismantle parts of the butter churn and related equipment to clean.

(b) Worker will change pipes and hoses to run CIP.

3

(c) Worker will spray with water hose the inside of vats and churn.

(d) Worker will initiate operation of CIP via touch screen monitor and will make adjustments as needed.

(e) Worker will use foaming hose to hose down outside of equipment and water hose for rinsing.

(f) Worker will retrieve fluid samples during the process and at the conclusion and take samples to the Butter Dept. Lab to complete tests.

(g) Once CIP is completed, Worker will reconnect parts and change pipes and hoses to begin product processing.

(8) Worker will use touch screen monitor to release cream from silos and salt to initiated production.

(9) Worker will take samples to test in the Butter Dept Lab to verify the butter product is ready for production/packaging.  The Worker will continue to take samples throughout the production to verify product is meeting standard requirements.  Worker will make adjustments as needed using the touch screen monitor.

(10) Worker will use water hose to clean up spills.

(11) Worker will make notification to Maintenance Dept of any breakdown in equipment that Worker can't correct.

(12) Worker will stay in contact with other Retail Line Operators (Bulk Packer, Chip Operator, Quarter Pound Operator and Solid Quarter Pound Operator) regarding any shutdowns or changes in production.

(See Pl.'s SUF at 29.)

In December 2013, plaintiff was diagnosed with distal hereditary motor neuropathy –– a progressive disorder that results in leg weakness.  (See Pl.'s SUF at 3.)  This condition causes progressive loss of motor function in the legs and foot

4

drop and can impede the ability to walk, balance, bend, and lift below the waist.  (See Def.'s SUF at 1.)  As a result of his disability, plaintiff cannot get into or out of a squatting position, maintain his balance while walking without wearing leg braces, or bend down and lift things up from the floor while wearing his leg braces.  (See Def.'s SUF at 2(a)(i)-2(a)(vi); Pl.'s Resp. to Def.'s SUF at 2.)  Following his diagnosis, plaintiff began wearing foot braces while at work to help prevent him from tripping or falling.  (See Pl.'s SUF at 4.)

Plaintiff did not formally request accommodations for his disability from Darigold HR but worked out informal "accommodations" with his supervisors.  (See Pl.'s Resp. to Def.'s SUF at 7(a).)  For example, plaintiff was not required to wear composite shoes because they were incompatible with his leg braces.  (See Def.'s SUF at 7(b).)  Another "accommodation" made for plaintiff was that he was not required to "down stack" or unload 55-pound boxes of butter from the bottom two layers of a pallet.  (See Pl.'s SUF. at 45.)  In order to run quality control tests on the butter, Darigold employees place a pallet on the ground and then place a 55-pound box of butter on the pallet in order to run it through the metal detector.  (See id. at 46-47.)  There were approximately five to six boxes of butter, each layer separated by a pallet.  (See id.)  Plaintiff testified that the "accommodation" that he worked out with his supervisors was for a co-worker to place the bottom layers of butter boxes and pallets on the ground after they had gone through the metal detector, and plaintiff would do the same with the top layers of butter and pallets, which allowed plaintiff to avoid lifting below his

1    waist.[2]  (See id. at 48.)

2            On December 4, 2017, plaintiff slipped on a wet

3    substance while at work and injured his back.  (See id. at 5.)

4    After plaintiff's injury, his health care provider gave him

5    activity restrictions, including no walking or standing for

6    prolonged periods of time and no lifting more than 20 pounds, and

7    he was placed on leave because he could not perform his butter

8    churn operator duties with those restrictions.  (See Def.'s SUF

9    at 7(c).)  Plaintiff understood that in order to return to work,

10   Darigold required him to complete a fitness-for-duty examination

11   stating that those restrictions had been removed and that he

12   could walk and stand for prolonged periods of time and lift at

13   least 55 pounds.  (See id.)

14           Between April 16, 2010 and December 4, 2017, Darigold

15   did not have any disciplinary or safety records indicating that

16   it was concerned with plaintiff's ability to safely or

17   effectively perform his job. (See Pl.'s SUF at 6.)  However,

18   after plaintiff's injury and the subsequent workers' compensation

19   process, Darigold learned of plaintiff's diagnosed disability and

20   its progressive nature.  (See id. at 7.)  In a January 10, 2018,

21   email from Shawn Reiersgaard, Darigold's Workers' Compensation

22   Manager, to Amy Glesner, a claims manager for Darigold's Workers'

23   Compensation insurer, Mr. Reiersgaard stated:

24           I believe the fundamental issue here is
             [plaintiff's] doctor allows a return to modified
25           duty with conditions.  Darigold has not allowed

26   _____

27           [2]   Darigold states that it was not an accepted procedure
     for five to six pallets of butter boxes to be stacked on top of
     each other.  (See Def.'s Resp. to Pl.'s SUF 48 (Docket No. 43-
28   1).)

                                   6

> [plaintiff] to return to temporary modified duty
> because we are concerned his pre-existing
> condition (which [is] not associated with the WC
> claim) put[s] him and his coworkers at risk of
> injury. [Plaintiff] wants to work, Darigold
> wants him to work; we just need assurances that
> he can work for Darigold at his job of injury
> ("JOI") or at Temporary Modified Duty tasks
> without a risk to his health and safety caused by
> his pre-existing condition.

(See id. at 8.)  In an email from Ms. Glesner to Mr. Reiersgaard on March 27, 2018, Ms. Glesner wrote that plaintiff had received a full duty release for his workers compensation claim.  (See id. at 9.)  She also wrote she that she assumed Darigold would not be bringing plaintiff back to work until it knew that he was "fit for the job" and noted that "our nurse is reaching out to see how quickly we can get [plaintiff] in for a [functional capacity evaluation] with a therapist" and that "they would then need a detailed job description to evaluate if [plaintiff] is capable of doing the tasks."  (See id.)

In a letter dated April 27, 2018, the Idaho Industrial Commission stated that plaintiff "may return to the time-of-injury duties on 4/24/18."  (See id. at 10.)  Despite this, Darigold placed plaintiff on Administrative Leave pending a determination regarding his underlying non-work related disability.  (See id. at 11.)  Darigold sent plaintiff to Dr. Cody Heiner on May 14, 2018 for a Fitness for Duty/Functional Capacity Evaluation to identify whether he could perform the essential functions of his job with his disability.  (See id. at 12.)  On May 14, 2018, Dr. Heiner informed Darigold that plaintiff was "capable of working with . . . accommodations."  (See id. at 13.)  Dr. Heiner stated that "the accommodations

7

already worked out with [plaintiff] remain appropriate at this time." (See id.) He emphasized that plaintiff should "limit ladder use, and use only stationary ladders of no more than 6 steps, and always with both hands free to grip." (See id.) Dr. Heiner also stated that plaintiff should not lift below the waist level because of his inability to bend at the ankles to lift with the legs. (See id.)

Instead of returning plaintiff to work, Darigold told plaintiff that it could no longer make the "accommodations" that plaintiff believed he had previously been given. (See Def.'s Resp. to Pl.'s SUF 14.) Darigold's Senior Director of Human Resources for the Field, Dana Kennedy, testified that plaintiff could not return to work because, among other reasons, he could not lift below waist level because of his inability to bend at the ankles and lift with the legs. (See id. at 15.) Darigold also stated that it did not return plaintiff to work after receiving Dr. Heiner's Fit-for-Duty evaluation because it was unclear whether plaintiff could perform the essential functions of the position with or without reasonable accommodation. (See Pl.'s SUF at 16.)

In a May 24, 2018 email to Darigold's Total Rewards Manager, Ms. Erin Graf, Mr. Reiersgaard stated that they should notify "Darigold Legal that [plaintiff] has completed a fit-for-duty evaluation" and that they find plaintiff "unfit for duty", and that because no alternative position was available, HR recommends termination." (See id. at 17.) In response, Ms. Graf stated that Darigold "may want to get some legal guidance on this one" because it had to "offer some form of interactive process to

ensure that we've exhausted all obligations we have due to ADA before we get to the state of separation from service."  (See id.)  Ms. Kennedy reiterated that advice was required because plaintiff "truly believes he was provided accommodations in the past and does not understand why those accommodations cannot continue."  (See id. at 55.)

Darigold then arranged for a physical therapist, Scott Billing, to perform a KEY Functional Assessment of plaintiff to determine whether he could perform the essential functions of the job.  (See id. at 19.)  Mr. Billing's assessment was detailed, and plaintiff was asked if he could perform certain maneuvers, like pushing, pulling, and carrying various amounts of weights, and to perform a variety of "Posture Components" like kneeling, crawling, and climbing stairs.  (See id. at 20.)  Plaintiff was able to lift 55.6 pounds from 30 to 60 inches above his shoulders with 23 repetitions, and 65.6 pounds from 30 to 18 inches at desk/chair level with 27 repetitions.  (See Def.'s Resp. to Pl.'s SUF 22.)  The only lifting activity that plaintiff could not perform was from 18 inches to the floor because of plaintiff's leg braces and leg weakness.  (See Pl.'s SUF at 21.)  Mr. Billing also reported that plaintiff performed "Kneeling" by placing his right hand on the desk when getting into position.  (See id. at 22.)

On September 7, 2018, Mr. Billing informed Darigold of his conclusions.  (See id. at 23.)  He stated that plaintiff "demonstrated the current capacity for medium duty work" but that "accommodations may need to be made for chair to floor lifting as he was unable to perform this particular component of the

1   assessment." (See id.)  Mr. Billing noted that this was because

2   plaintiff could not perform squatting maneuvers due to his leg

3   braces and leg weakness.  (See id.)  Following the evaluation by

4   Mr. Billing, Darigold did not return plaintiff to work because

5   "it was unclear that plaintiff could perform the essential

6   functions of the position with or without reasonable

7   accommodation." (See id. at 24.)

8         On September 20, 2018, Darigold terminated plaintiff.

9   (See id. at 25.)  Darigold stated that plaintiff was "recently

10  evaluated by an Occupation Medicine physician and on May 14th, it

11  was concluded that you did not have a full release to return to

12  work by the physician." (See id.)  The letter also stated that

13  after plaintiff "requested a reconsideration of [his] status," a

14  functional capacity test was completed, and the results indicated

15  limitations that would not allow plaintiff to complete the

16  essential duties of his job and that plaintiff could not be

17  reasonably accommodated.  (See id. at 25.)  The letter concluded

18  that because plaintiff was "unable to provide medical

19  certification of full release to return to work", defendant could

20  no longer hold his position.  (See id.)

21        In Ms. Kennedy's deposition, she testified that

22  plaintiff's disability prevented him from being able to perform

23  essential functions 7(a-e) and 10.[3]  (See Def.'s Resp. to Pl.'s

24  SUF 31.)  Darigold concluded that plaintiff could not perform

25  these essential functions, including the ability to pick up a

26  _____

27        [3]    These include the essential Cleaning in Place
    functions, where the worker dismantles parts of the butter churn
28  and related equipment to clean and using a water hose to clean up
    spills on the factory floor.

water hose, because he "could not bend from the waist or lift from the waist." (See Pl.'s SUF at 32.) When Ms. Kennedy was asked whether she had an understanding of whether plaintiff could pick up a hose off the ground when determining whether plaintiff could perform the essential functions of his job, she testified, "[b]ased on the information that others were having to do his job that he couldn't do -- again, getting back to the stacking of the pallets -- that really led us to come to the conclusion that he wasn't able to do his position." (See id. at 34.) Ms. Kennedy did not know which essential function of plaintiff's job required pallets to be stacked, but stated that "the pallets were used to help him do his job and they were stacked very unsafely and high." (See id. at 35.)

Ms. Kennedy additionally testified that that the problem with the "accommodation" that plaintiff had worked out with his supervisors was that the pallets were "not bound together." (See id. at 50.) Ms. Kennedy emphasized that the pallets were just stacked on top of each other and that it was an environment where it was wet and slippery and that there was a potential for a fall. (See id.) Ms. Kennedy testified that the pallets created a greater ability for someone to fall because the factory floor was not a dry surface, and "you're walking and you're reaching and somebody that already needs braces -- it's not something that is a Darigold practice." (See id. at 51.) Ms. Kennedy also stated that "this is a facility where there is water on the floor at all times" and that this "just wasn't a safe environment to have somebody in that was not stable in his

11

balance." (See id. at 61.)[4]  When Ms. Kennedy was asked if she
had determined that plaintiff's pre-existing disability put
plaintiff and his coworkers at risk of injury, she testified that
Darigold believed that "it would potentially be a safety issue
for him" because "[f]or an individual who has braces in that
environment, lifting, there is a potential to slip and fall" and
that "those pallets could have fallen any time, the way they were
stacked." (See id. at 62.)

        In his deposition, plaintiff gave a detailed
explanation, while referencing photographs of the workspace,
about how he would use alternative body movements to accomplish
the essential functions that other Butter Churn Operators might
have accomplished by bending at the waist. (See id. at 40.)  In
his deposition, plaintiff testified that if he had to do
something below waist level, such as picking up the water hose,
he could always get on his knees rather than bend at the waist.
(See id. at 41-42.)  Plaintiff stated that "down stacking"
pallets and boxes was not a part of his job duties as a Butter
Churn Operator, but that if "a supervisor asks me to do something
that's not my job, I take it as, I need your help with one thing
real quick." (See Pl.'s SUF at 49.)

        Darigold had always considered plaintiff to be a good
employee before terminating him. (See Pl.'s SUF at 30.)  Prior
to his termination, Darigold allowed plaintiff to use various

---

[4]    In an email from May 21, 2018, Ms. Thorpe West stated
that plaintiff's supervisor, Mr. Kenny Rambow, "was aware through
others that [plaintiff] did have a propensity to fall and that
"on the day of the incident, it was reported that [he] had fallen
three other times that day." (See id. at 63.)

forms of leave from December 5, 2017 to September 20, 2018.  (See Def.'s SUF at 7(d).)  However, Darigold believed that extending plaintiff's leave of absence past the date his employment was terminated was not a reasonable accommodation because plaintiff's physical restrictions due to his disability were permanent.  (See Def.'s SUF at 5.)  Darigold also contends that it "engaged in the interactive accommodation process and determined that [it was] unable to accommodate plaintiff's restrictions."  (See Pl.'s SUF at 53.)  Ms. Kennedy testified that the steps Darigold took to identify reasonable accommodations were (1) reaching out to doctors, (2) performing the functional analysis, (3) having plaintiff analyzed by Mr. Billing, and (4) having three or four specialists and doctors review plaintiff's medical records to help Darigold identify a way to bring plaintiff back.  (See id. at 54.)

III. Discussion

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).  If the moving party has properly supported its motion, the burden shifts to the non-moving party to set forth specific facts to show that there is a genuine issue for trial.  See id. at 324.  "Where the record taken as a whole could not lead a rational trier of fact

to find for the non-moving party, there is no genuine issue for trial." Matsuhita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  Any inferences drawn from the underlying facts must, however, be viewed in the light most favorable to the party opposing the motion.  See id.

The enforcement provision of Title I of the ADA, under which plaintiff brought suit, provides that:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).  Under the ADA, an employee bears the ultimate burden of proving that he is (1) disabled under the Act, (2) a "qualified individual with a disability," and (3) discriminated against "because of his disability."[5]  See Nunes v. Wal-Mart Stores, Inc., 164 F.3d 1243, 1246 (9th Cir. 1999). Discrimination includes adverse employment action, but it also "includes an employer's not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified. . . employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." US Airways, Inc. v. Barnett, 535 U.S. 391, 396 (2002) (quoting § 12112(b)(5)(A)); see also Mendoza

---

[5]   "Courts interpret the standards for disability [discrimination] under the ADA and the IHRA identically. Accordingly, when the court refers to one statute, its reference impliedly includes the other." Ward v. Sorrento Lactalis, Inc., 392 F. Supp. 2d 1187, 1190 n.1 (D. Idaho 2005) (citation omitted).

1  v. Roman Catholic Archbishop of Los Angeles, 824 F.3d 1148, 1150

2  (9th Cir. 2016) (stating that the ADA "defines discrimination to

3  include an employer's failure to make [a] reasonable

4  accommodation.").

5          Once an employee establishes a prima facie case of

6  disability discrimination, ordinarily the burden shifts to the

7  employer to provide "a non-discriminatory reason for that

8  discharge which 'disclaims any reliance on the employee's

9  disability in having taken the employment action.'" Snead v.

10 Metro. Prop. & Cas. Ins. Co., 237 F.3d 1080, 1093 (9th Cir.

11 2001).  If an employer establishes a non-discriminatory reason

12 for the discharge which disclaims any reliance on the employee's

13 disability, the employee "bears the burden at trial of showing

14 that [the employer's] reason for. . . termination was

15 pretextual."  Id.  However, in cases such as this where the

16 employer acknowledges that it relied upon the terminated

17 employee's disability as its stated reason for the termination

18 burden shifting does not apply.  Mustafa v. Clark Cnty. Sch.

19 Dist., 157 F.3d 1169, 1175-76. (9th Cir. 1998).  When an

20 "employer acknowledges reliance on the disability in the

21 employment decision, the employer bears the burden of showing

22 that the disability is relevant to the job's requirements."  See

23 id. at 1176.[6]

24 _____

25          [6]  Because Darigold contends that plaintiff cannot prove
   his prima facie case that he is a "qualified individual", it
26 argues that the "relevance of [p]laintiff's disability to the
   requirements of his job is immaterial" and accordingly did not
27 offer any evidence or arguments related to the relevance of
   plaintiff's disability to the requirements of the job.  (See
28 Def.'s Resp. to Pl.'s Mot. for Summ. J. at 3 n.2(Docket No. 43).)

1      A.   Qualified Individual

2           The central issue here is whether plaintiff is a

3  "qualified individual" under the ADA "who, with or without

4  reasonable accommodation, can perform the essential functions of

5  the employment position that such individual holds or desires."

6  42 U.S.C. § 12111(8); see also 29 C.F.R. § 16320.2(m). [7]

7  "Essential functions" are "fundamental job duties of the

8  employment position . . . not includ[ing] the marginal functions

9  of the position."  29 C.F.R. § 1630.2(n)(1); see Cripe v. City of

10  San Jose, 261 F.3d 877, 887 (9th Cir. 2001).  "If a disabled

11  person cannot perform a job's 'essential functions' (even with a

12  reasonable accommodation), then the ADA's employment protections

13  do not apply."  Cripe, 261 F.3d at 884–85.  "If, on the other

14  hand, a person can perform a job's essential functions, and

15  therefore is a qualified individual, then the ADA prohibits

16  discrimination" with respect to the employment actions outlined

17  in 42 U.S.C. § 12112(a).  Id.  An employee must be "qualified" at

18  the time of the alleged discriminatory conduct.  Kaplan v. City

19  of N. Las Vegas, 323 F.3d 1226, 1230 (9th Cir. 2003).

20           "The ADA does not require an employer to exempt an

21  employee from performing essential functions or to reallocate

22  essential functions to other employees."  See Dark v. Curry

23  Cnty., 451 F.3d 1078, 1089 (9th Cir. 2006).  "Although the

---

25           [7]   The parties do not dispute that plaintiff is disabled
26  under the terms of the ADA, (see Pl.'s SUF at 3), that plaintiff
    suffered the adverse employment action of the termination of his
27  employment, (see id. at 25), or that plaintiff was terminated
    because of his disability.  (See id.; Def.'s Resp. to Pl.'s Mot.
28  for Summ. J. at 3.)

16

plaintiff bears the ultimate burden of persuading the fact finder that he can perform the job's essential functions . . . an employer who disputes the plaintiff's claim that he can perform the essential functions must put forth evidence establishing those functions."  Bates v. United Parcel Serv. Inc., 511 F.3d 974, 991 (9th Cir. 2007).

The Equal Employment Opportunity Commission ("EEOC")'s guidelines list the non-exhaustive factors that the court should consider in determining whether a job duty is "essential": (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; (5) the terms of a collective bargaining agreement; (6) the work experience of past incumbents in the job; and/or (7) the current work experience of incumbents in similar jobs.  29 C.F.R. § 1630.2(n)(3)(i)-(vii); see also 42 U.S.C. § 12111(8).

A job function may also be considered essential for any of several reasons, including: (i) "the function may be essential because the reason the position exists is to perform that function"; (ii) "the function may be essential because of the limited number of employees available among whom the performance of that job can be distributed"; and/or (iii) "the function may be highly specialized so that the incumber in the position is hired for his or her expertise or ability to perform the particular function."  29 C.F.R. § 1630.2(n)(2).

Darigold argues that plaintiff is not a "qualified

17

individual" under the ADA who could perform the essential
functions of his post with or without reasonable accommodations.
(See Def.'s Mot. for Summ. J. at 11-15.)  Plaintiff counters that
he is a "qualified employee", noting that he was able to perform
the essential functions of his post for four years following his
diagnosis with informal "accommodations" that he had worked out
with his supervisors.  (See Pl.'s Mot. for Summ. J. at 10-19.)
Plaintiff also emphasizes that he was cleared to return to work
with accommodations by Dr. Heiner and that Mr. Billing stated
that plaintiff could return to medium-duty work with possible
accommodations for chair to floor lifting.  (See Pl.'s SUF at 13,
23.)  The court will address each disputed essential function in
turn.

          1. Squatting or Stooping Near Floor

        Darigold argues that Butter Churn Operators must be
able to stoop or squat near the floor.  (See Def.'s Reply in
Supp. of Mot. for Summ. J. at 3 (Docket No. 45).)  It states that
squatting or stooping is necessary in order to perform the
essential functions of taking samples of butter and to perform
Cleaning In Place.  (See id.)  In particular, Darigold argues
that the Butter Churn Operators must squat or stoop to access
sample ports and to change, repair or replace hose, pipes,
valves, and other equipment as part of the CIP process.  (See
id.)  Plaintiff is indisputably unable to get into or out of a
squatting position because of his disability.  (See Def.'s SUF at
2(iii).)  Instead, plaintiff would kneel to accomplish these
essential functions.  (See Pl.'s SUF at 40-42.)

        The "Posture Requirement" section of the Butter Churn

Operator "Functional Job Analysis" states that the "[w]orker has choice in bending, kneeling, squatting, and stooping in performance of some duties below waist level." (See Decl. of Karin Jones in Supp. of Mot. for Summ. J. at Ex. 28, p.6 ("Jones Decl.").)  Despite this, Darigold apparently contends that kneeling on the floor in the Butter Department is not acceptable for safety reasons. (See Def.'s Reply in Supp. of Mot. for Summ. J. at 8.)  Darigold argues that "if someone's hand or knee touches the ground . . . it can result in the transfer of a contaminant from the floor (including the chemicals used to clean during the CIP process) to the equipment, and possibly to the product itself." (See Decl. of Nick Kinslow in Supp. of Def.'s Mot. for Summ. J. at ¶ 7 ("Kinslow Decl.") (Docket No. 34-21).)  However, Darigold has provided no evidence as to why a knee-pad covered knee would cause any more of a contamination risk to Darigold's products than an employee's shoes or why plaintiff's hand was more likely to touch the ground while kneeling than any other employee who performs these essential functions by squatting or stooping. (See Pl.'s Reply in Supp. of Mot. for Summ. J. at 16 (Docket No. 46).)[8]  Darigold has not produced any

_____

[8]    Plaintiff disputes defendant's statement that plaintiff could not get in or out of a kneeling position without holding onto something. (See Pl.'s Resp. to Def.'s SUF at 2.)  Although Darigold argues that plaintiff would grab onto machinery parts to lower and raise himself from a kneeling position, plaintiff argues that Darigold has failed to present any evidence that it is not the standard practice for Darigold employees to grab, lean or even sit on equipment in the way that plaintiff did and notes that there is no evidence that he ever damaged any Darigold property during his tenure. (See Def.'s Resp. to Pl.'s Mot. for Summ. J. at 7; Pl.'s Reply in Supp. of Mot. for Summ. J. at 10.)

1   health and safety protocols that would allow this court to

2   determine the risks of cross-contamination from kneeling as

3   opposed to squatting or stooping.  Perhaps most importantly, if

4   there were such a high risk of cross-contamination because

5   plaintiff knelt to perform these essential functions, it begs the

6   question why no one at Darigold raised any safety concerns about

7   plaintiff's kneeling in the four years after his disability

8   diagnosis.

9        Accordingly, there is a genuine issue of material fact

10  as to whether allowing him to perform the essential functions of

11  taking samples of butter and cleaning in a kneeling position,

12  rather than by squatting or stooping, constitutes a reasonable

13  accommodation.

14            2. <u>Lifting 55-Pound Boxes from Below Waist Level</u>

15       Darigold states that an essential function of the

16  Butter Churn Operator job is the ability to lift 55-pound boxes

17  of butter from below waist level and "down stack" them onto

18  pallets. [9]  (<u>See</u> Def.'s Reply in Supp. of Mot. for Summ. J. at 4.)

19  In Darigold's view, an essential part of the Butter Churn

20  Operator job is to cover for the Bulk Pack Operator's duties

21  during meal and rest breaks and to periodically work in the Re-

22  Melt Room where pallets of butter are emptied out of boxes and

23

24       [9]    Darigold has at times appeared to contend that
     plaintiff was unable to pick up a water hose off the ground in
     order to perform many of the essential cleaning functions.  (<u>See</u>
25   Pl.'s SUF at 31-32.)  However, plaintiff asserts that he had no
     trouble picking up the water hose and could always get on his
26   knees to do so.  (<u>See</u> <u>id.</u> at 42.) Darigold has not focused on
     whether or not plaintiff could pick up a hose in order to clean
27   in its motions and therefore the court will not address this
     issue further.
28

added back into the production line.  (See id. at 5.)  Plaintiff
is unable to bend down and lift things up from the floor below
waist level because his leg braces prevent him from bending at
the knees and lifting with his legs rather than his back.  (See
Def.'s SUF at 2(vi).)

In the Functional Job Analysis that Darigold
commissioned on April 16, 2018 as a result of plaintiff's
disability, providing support during breaks for the Bulk Packer
is not listed as an "Essential Function" but rather appears under
the category "Other Functions."  (See Ex. 28 to Jones Decl. at
3.)  Working in the Re-melt room is not listed in the Functional
Job Analysis at all.  Plaintiff testified that these functions
were not part of his job as a Butter Churn Operator but something
that he assisted with if asked by his supervisors.  (See Pl.'s
SUF at 48.)  Nevertheless, Darigold now contends that covering
for these posts, and the heavy lifting that these posts require,
are "essential functions" of a Butter Churn Operator because of
the "limited number of employees available among whom the
performance of that job function can be distributed."  See 29
C.F.R. § 1630.2(n)(2)(ii).

Given the conflicting evidence submitted by the
parties, there is a genuine issue of material fact as to whether
lifting heavy boxes of butter below waist level in order to
provide support during breaks for the Bulk Packer Operator and to
assist in the Re-melt room is an essential function of the Butter
Churn Operator position.[10]

---

[10]   Because there is a genuine issue of material fact as to
whether lifting heavy boxes of butter below waist level in order

1          ### 3. Climbing Stairs Using a Single Handrail

2          Darigold also argues that the ability to climb up and

3  down stairs while holding only onto a single handrail on one side

4  of the staircase is an essential requirement of the Butter Churn

5  Operator Position.  (See Reply in Supp. of Mot. for Summ. J. at

6  3.)  The "Functional Job Analysis" of the Butter Churn Operator

7  position states that Butter Churn Operators are occasionally

8  required to climb stairs.  (See Ex. 11 to Jones Decl. at 3.)

9  During each shift, a Butter Churn Operator is required to climb a

10  set of stairs in order to view and log information on a computer

11  screen located on a platform and to look into the door and site

12  glass of the butter churn to make sure that the consistency looks

13  right. (See Kinslow Decl. at ¶ 5.)  Those stairs have only one

14  handrail due to equipment on the other side which hinders the

15  installation of a handrail there.  (See id. at ¶ 6.)  Darigold

16  states that it is unsafe to hold onto the site glass on the side

17  of the stairs which lacks a handrail because "it was not built

18  for that purpose" and the site glass gets very hot and slick

19  during the four-hour Cleaning in Place process that occurs every

20  24 to 48 hours.  (See id.)  Darigold also contends that the

21  Butter Churn Operator sometimes needs a free hand while climbing

22  the stairs to carry the clipboard used for logging the readings

23  from the screen or a replacement site glass and clamp.  (See id.)

24          Despite the evidence proffered by Darigold, there is

25  to cover for the Bulk Packer Operator on meal and rest breaks or

26  to assist in the Re-Melt room are essential functions of the
   Butter Churn Operator position, the court need not determine at

27  this stage whether the stacking of pallets or having another co-
   worker unload the bottom layers of pallets is a reasonable

28  accommodation.

22

nothing in the record that affirmatively demonstrates plaintiff
was incapable of ascending stairs while holding only one
handrail.  Although plaintiff did testify that he sometimes would
place his hand on the site glass in addition to the handrail when
climbing stairs, (see Jones Decl. at Ex. 1, 285:20–286:14.), it
is not clear from the record that plaintiff was unable to ascend
the stairs without doing so.  While plaintiff apparently used two
handrails when climbing stairs during the Key Fitness Assessment
with Mr. Billing, it is not clear that he was ever tested on his
ability to ascend or descend stairs with one handrail.  (See
Pl.'s Reply in Supp. of Mot. for Summ. J. at 11; Jones Decl. Ex.
18 at 5.)  Although Dr. Heiner stated that plaintiff should use
stationary ladders with both hands free to grip, (see id. at Ex.
15), he does not appear to have ever evaluated whether plaintiff
could ascend stairs with only one handrail.  After considering
all the evidence, the court concludes that there is a genuine
issue of material fact as to whether plaintiff can ascend a
staircase with one handrail in order to in order to view and log
information on a computer screen located on a platform.[11]

　　　　4. Physical Requirements as Essential Functions

　　　　As illustrated above, Darigold's central argument is
that many of plaintiff's permanent physical limitations due to
his disability make him unable to meet many of the physical
requirements for performing the essential functions of Butter
churn operator position.  (See Def.'s Mot. for Summ. J. at 13.)

---

[11]   The court does not decide whether using one hand on a
handrail to ascend or descend the stairs is an essential part of
the Butter Churn Operator position.

1    While the court finds this argument unpersuasive at the summary

2    judgment stage for the reasons set forth above, it is not clear

3    whether such physical requirements can constitute the essential

4    functions of a post under the ADA.  The Interpretive Guidance on

5    Title I of the Americans with Disabilities Act, 29 C.F.R. Pt.

6    1630, App., elaborates on the reasonable accommodation process by

7    stating that if a position requires an employee to pick up fifty

8    pound sacks and carry them from the company loading dock to the

9    storage room, "the essential function and purpose of the job is

10   not the requirement that the job holder physically lift and carry

11   the sacks, but the requirement that the job holder cause the sack

12   to move from the loading dock to the storage room."  Id.

13        Darigold attempts to explain this apparent

14   contradiction in their argument by saying that plaintiff has

15   "failed to take into account the specific environment in which

16   the position's essential functions were performed, which made

17   compliance with Darigold's health and safety protocols critical."

18   (See Def.'s Resp. to Pl.'s Mot. for Summ. J. at 5.)  Darigold

19   contends that the essential functions of plaintiff's position

20   implicitly included the ability to use or avoid certain physical

21   movements as needed to conform to Darigold's standards.  (See

22   id.)  However, as stated above, Darigold has not produced or

23   identified any "reasonable health and safety protocols" for the

24   court to analyze nor has it asserted that its employees have been

25   informed of these protocols or that they are enforced.  (See

26   Pl.'s Reply in Supp. of Mot. for Summ. J. at 3.)  Therefore, the

27   court cannot readily determine whether certain body movements or

28   physical functions constitute essential functions of the Butter

1  Churn Operator position because using other movements would

2  violate Darigold's health and safety standards.[12]

3          Accordingly, after considering the evidence presented

4  by both parties, the court determines that there is a genuine

5  issue of material fact as to whether plaintiff was a "qualified

6  individual" who, with or without reasonable accommodation, could

7  perform the essential functions of the employment position.  The

8  parties' motions for summary judgment on this issue will

9  therefore be denied.

10      B.    <u>Examinations in Violation of 42 U.S.C. § 12112(d)(4)(A)</u>

11          Plaintiff argues that Darigold inquired into

12  plaintiff's medical history and records regarding his disability

13  in violation of 42 U.S.C. § 12112(d)(4)(A) by forcing him to

14  undergo two fitness-for-duty examinations.  (See Pl.'s Mot. for

15  Summ. J. at 24.)[13]  Employers "shall not require a medical

16          [12]    Darigold primarily relies on unpublished out of circuit
17  precedent for its contention that physical functions can
    constitute essential functions of a position.  Darigold also
18  relies on one unpublished Ninth Circuit case, <u>Taylor v. Renown
    Health</u>, 675 F. App'x 676, 677 (9th Cir. 2017), in which the Ninth
19  Circuit affirmed a district court's finding that lifting over 50
    pounds was an essential function of a Certified Nursing
20  Assistant.  Not only is <u>Taylor</u> not binding, it also employed a
    different standard than the one at issue here for determining
21  what constitutes a "qualified individual" under the ADA.  In
    <u>Taylor</u>, the plaintiff contended she was "regarded as disabled",
22  which requires a plaintiff to make prima facie showing that she
    was able to perform the essential functions of the job without
23  accommodation in order to demonstrate that she was a "qualified
    individual."  <u>Taylor</u>, 675 F. App'x at 677.  This is not the test
24  at issue here, and therefore, the court does not find <u>Taylor</u>
25  persuasive.

26          [13]    Plaintiffs need not prove that they are "qualified
27  individuals" with a disability in order to bring claims
    challenging the scope of medical examinations under the ADA.  <u>See</u>
28  <u>Fredenburg v. Contra Costa Cnty. Dept. of Health Servs.</u>, 172 F.3d

examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity."  42 U.S.C. § 12112(d)(4)(A).  The implementing regulations also state that an employer "may make inquiries into the ability of an employee to perform job-related functions."  Indergard v. Ga.-Pac. Corp., 582 F.3d 1049, 1053 (9th Cir. 2009) (citing 29 C.F.R. § 1630.14(c)); see also 29 CFR §§ 1630.13; 1630.14(c).  The "business necessity" standard is "quite high, and is not to be confused with mere expediency." Brownfield v. City of Yakima, 612 F.3d 1140, 1145 (9th Cir. 2010).  The "business necessity" test is objective, and the employer bears the burden of demonstrating business necessity. See id. at 1146.

Plaintiff complains that Darigold inquired into his disability after learning about his diagnosis from his workers' compensation records, in violation of Darigold's EEOC policy.[14] Plaintiff relies on Yin v. California,[15] 95 F.3d 864, 868 (9th 1176, 1181 (9th Cir. 1999).

---

[14]   Darigold's EEOC policy states that "[n]o questions in any examination, application form, or other personnel proceeding, will be framed as to attempt elicit information concerning protected characteristics from an applicant, eligible candidate, or employee."  (See Pl.'s SUF at 58.)

[15]   Plaintiff also purports to rely on Bentivegna v. U.S. Department of Labor, 694 F.2d 619, 621-22 (9th Cir. 1982), and Cripe, 261 F.3d at 890.  However, neither case deals with medical examinations, but rather concern the requirement under 29 C.F.R. § 32.14 that job qualifications that tend to exclude people with disabilities must be consistent with business necessity.  These cases are therefore of little assistance to the court on this

Cir. 1996), and contends that the business necessity standard cannot be met without showing that the "employee's health problems have had a substantial and injurious impact on an employee's job performance."  However, the Ninth Circuit has made clear that the business necessity standard may be met even before an employee's work performance declines if the employer is faced with "significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job."  Brownfield, 612 F.3d at 1146.  The EEOC Enforcement Guidance also states that the "business necessity" standard may be met when an employer is given reliable information "by a credible third party that an employee has a medical condition, or the employer may observe symptoms indicating that an employee may have a medical condition that will impair his/her ability to perform essential job functions or will pose a direct threat."  See EEOC Enforcement Guidance on Disability-Related Inquiries and Medical Examinations of Employees Under the ADA, (EEOC July 26, 2000).

        The court agrees that Darigold had an objective and legitimate basis to doubt plaintiff's ability to perform his duties.  In December 2017, plaintiff had a significant fall at work and Darigold learned through the workers' compensation process that plaintiff had distal hereditary motor neuropathy.  (See Def.'s Reply in Supp. of Mot. for Summ. J. at 12.)  In a medical evaluation for plaintiff's back injury shortly after his fall, plaintiff's doctor noted that plaintiff "falls all the

point.

time" and had "significant paralysis of his dorsiflexors and
plantar flexors of his feet with atrophy of the calf muscles."
(See Jones Decl. at Ex. 3.)  Another doctor who examined
plaintiff shortly after his injury noted that plaintiff was "only
able to partially extend both his lower legs", "ha[d] no strength
or range of motion and his feet or ankles", and "no strength due
to his neuropathy."  (See id. at Ex. 5.)  Moreover, Darigold also
learned from plaintiff's supervisor that plaintiff "did have a
propensity to fall" and that "on the day of the final incident,
it was reported that [plaintiff] had fallen three other times
that day."  (See Pl.'s SUF at 63.)

        Plaintiff argues that there was no need for the
functional capacity evaluation by Mr. Scott Billing because Dr.
Heiner had informed Darigold that plaintiff could return to work
with the same "accommodations" previously provided. (See Pl.'s
Resp. to Def.'s SUF at 6(b).)  However, the evaluation by Mr.
Billing was much more thorough and provided significantly more
objective data than Dr. Heiner's evaluation regarding plaintiff's
physical abilities and restrictions.  (See Pl.'s SUF at 20; Jones
Decl. at Exs. 15, 16-18.)  In sum, the record clearly indicates
that the two medical examinations of plaintiff were job-related
and that Darigold had good cause for attempting to determine
whether plaintiff could safely perform his job.  See Yin, 95 F.3d
at 868.

        Moreover, it was plaintiff who requested that Darigold
grant him reasonable accommodations, or continue to provide him
the informal "accommodations" that he had worked out with his
supervisors, in connection with his return to work.  (See Mot.

28

1    for Summ. J. at 19.)  Under the ADA, "an employer may request

2    [that] the employee undergo a medical examination as part of a

3    request for reasonable accommodation."  Welch v. Haw. Med. Serv.

4    Ass'n, No. 01-00127 HG-BMK, 2002 WL 31028641, at *10 (D. Haw.

5    July 12, 2002) (citing Kennedy v. Superior Printing Co., 215 F.3d

6    650, 656 (6th Cir. 2000)).  The fitness-for-duty examinations

7    were therefore entirely appropriate for this reason as well.

8         Accordingly, the court concludes as a matter of law

9    that plaintiff's two fitness-for-duty examinations were permitted

10   by the ADA and were job-related and consistent with business

11   necessity.  Darigold is therefore entitled to summary judgment on

12   this claim.

13       C.   Good Faith Engagement in Interactive Process

14        Darigold additionally argues that plaintiff's request

15   for compensatory and punitive damages under the ADA fails as a

16   matter of law because such damages are not available where the

17   employer "demonstrates good faith" efforts to engage in an

18   interactive process in order to identify, if possible, a

19   reasonable accommodation that would permit plaintiff to maintain

20   his employment.  See 42 U.S.C. § 1981a(a)(3).  The term

21   "'reasonable accommodation' may include . . . acquisition or

22   modification of equipment or devices . . . and other similar

23   accommodations for individuals with disabilities."  42 U.S.C. §

24   12111(9).  "Once an employer becomes aware of the need for

25   accommodation, that employer has a mandatory obligation under the

26   ADA to engage in an interactive process with the employee to

27   identify and implement appropriate reasonable accommodations"

28   that will enable the employee to perform his job duties.

29

1  Humphrey v. Memorial Hospitals Ass'n, 239 F.3d 1128, 1137 (9th

2  Cir. 2001).  Ninth Circuit "precedent establishes that employers

3  must engage in an interactive, individualized dialogue with

4  employees to identify potential options which might serve as

5  reasonable accommodations."  Stephenson v. United Airlines, Inc.,

6  9 Fed. Appx. 760, 765 (9th Cir. 2001).

7        The interactive process requires communication and

8  good-faith exploration of possible accommodations between

9  employers and individual employees, and neither side can delay or

10 obstruct the process.  See id.  Employers who fail to engage in

11 the interactive process in good faith face liability for the

12 remedies imposed by the statute if a reasonable accommodation

13 would have been possible.  See id. at 1137–38.  "An appropriate

14 reasonable accommodation must be effective in enabling the

15 employee to perform the duties of the position."  See id. at 1137

16 (internal citations omitted).  The plaintiff bears the burden of

17 showing "the existence of a reasonable accommodation that would

18 have enabled him to perform the essential functions of an

19 available job."  Dark, 451 F.3d at 1088.  To avoid summary

20 judgment, however, plaintiff "need only show that an

21 accommodation seems reasonable on its face, i.e., ordinarily or

22 in the run of cases."  See id. (internal citations omitted).

23        Plaintiff argues that he had been provided reasonable

24 accommodations, albeit informal ones, which permitted him to

25 perform the essential functions of his job for four years

26 following his disability diagnosis.  (See Pl.'s Mot. for Summ. J.

27 at 20.)  As discussed above, the "accommodations" which both

28 parties identify plaintiff received were: (1) being exempt from

1   wearing composite shoes because he could not comfortably do so

2   while wearing his leg braces (see Def.'s SUF at 7(b)), and (2)

3   for a co-worker to place the bottom layers of butter boxes and

4   pallets on the ground after they had gone through the metal

5   detector, while plaintiff would do the same with the top layers

6   of butter and pallets which allowed plaintiff to avoid lifting

7   below the waist.[16]  (See Pl.'s SUF at 48.)  Plaintiff additionally

8   explained that he would use alternative body movements, such as

9   kneeling, to accomplish duties that might otherwise be

10  accomplished by bending at the waist or squatting.  (See id. at

11  40-42.)  That plaintiff was able to work as a Butter Churn

12  Operator for four years with these informal accommodations and

13  alternative body movements, without any disciplinary or safety

14  records indicating that Darigold was in any way concerned with

15  his ability to safely or effectively perform his job, (see Pl.'s

16  SUF at 6), satisfies plaintiff's duty to show that these

17  accommodations appear reasonable on their face.[17]  See Dark, 451

18  F.3d at 1088.

19         Darigold contends that it engaged in the interactive

20  process by reaching out to doctors, having the functional

21  analysis evaluations performed by Dr. Heiner and Dr. Billing, and

22  having three or four specialists/doctors review plaintiff's

23  _____

24       [16]   As detailed above, it is a genuine issue of material
     fact whether "down stacking" butter boxes to cover for the Bulk
25   Packer on meal and rest breaks or to assist in the Re-melt Room
     constitutes an essential function of the Butter Churn Operator
26   Position.

27       [17]   The court makes no finding at this stage as to whether
     these accommodations are reasonable as a matter of law.
28

medical records.  (See Pl.'s SUF at 54.)  Darigold also argues that it "far exceeded its obligation to engage with plaintiff to find a reasonable accommodation for his physical limitations" because "[p]laintiff was provided with almost a full year of leave, almost all of which was paid . . . and Darigold sought the advice and input of numerous internal stakeholders, both at corporate headquarters and in the Caldwell facility."  (See Def.'s Mot. for Summ. J. at 17.)  However, none of these steps identified by Darigold clearly constitute a reasonable accommodation that could have enabled plaintiff to perform his job duties, as required by the ADA.[18]  See Humphrey, 239 F.3d at 1127 (emphasis added).  The ADA "requires every type of employer to find ways to bring the disabled into its ranks, even when doing so imposes some costs and burdens." Cripe, 261 F.3d at 881.

Whether an accommodation is reasonable "depends on the individual circumstances of each case, and requires a fact-specific, individualized analysis of the disabled individual's circumstances and the [potential] accommodations." Dunlap v. Liberty Natural Prods., Inc., 878 F.3d 794, 799 (9th Cir. 2017)

_____

[18]   Both parties agree that additional paid medical leave would not have had any impact on plaintiff's ability to perform the essential functions of his job, albeit for different reasons. Plaintiff argues that it would have made no difference for Darigold to extend his leave as a reasonable accommodation because he was able and willing to return to work as a Butter Churn Operator. (See Pl.'s Resp. to Def.'s Mot. for Summ. J. at 16–17 (Docket No. 40).)  Defendant argues that it did not extend plaintiff's paid medical leave because his physical restrictions were permanent and would only worsen over time and because his health care providers could not safely revise or reduce his restrictions.  (See Def.'s Mot. for Summ. J. at 15.)

1    (internal citation omitted).  After considering the evidence

2    presented by both parties, the court concludes that there is a

3    genuine issue of material fact as to whether Darigold engaged in

4    the interactive process in good faith to determine whether a

5    reasonable accommodation could be identified for plaintiff.  The

6    court will therefore deny summary judgment on this issue.

7    IV.  <u>Motions to Seal</u>

8         Defendant requests that the court seal Exhibits 2-5, 8,

9    10, 12-15, 17-18, 21-22, and 28 to the Jones Declaration.  (<u>See</u>

10   Def.'s Mot. to Seal.)  Plaintiff requests that the court seal

11   Exhibits D, E, and K to the Declaration of Jeremiah Hudson in

12   Support of Plaintiff's Motion for Partial Summary Judgment,

13   ("Hudson Decl.") (Docket No. 37-3), and Ex. B to the Supplemental

14   Declaration of Jeremiah Hudson in Support of Plaintiff's Response

15   to Defendant's Motion for Summary Judgment, ("Supp. Hudson

16   Decl.") (Docket No. 40-1.).  (<u>See</u> Pl.'s Mot. to Seal.)  Defendant

17   does not oppose plaintiff's motion to seal.  (<u>See</u> Docket No. 44.)

18        A party seeking to seal a judicial record bears the

19   burden of overcoming a strong presumption in favor of public

20   access.  <u>Kamakana v. City & Cnty. of Honolulu</u>, 447 F.3d 1172,

21   1178 (9th Cir. 2006).  The party must "articulate compelling

22   reasons supported by specific factual findings that outweigh the

23   general history of access and the public policies favoring

24   disclosure, such as the public interest in understanding the

25   judicial process."  <u>Id.</u> at 1178-79 (citation omitted).  In ruling

26   on a motion to seal, the court must balance the competing

27   interests of the public and the party seeking to keep records

28   secret.  <u>Id.</u> at 1179.

1          Defendant and plaintiff seek to file under seal certain
2     documents that are subject to their stipulated protective order
3     and have been designated by the defendant as "confidential" and
4     "documents referring or related to confidential and proprietary
5     business information; . . . or confidential policies, procedures
6     or training materials of defendant." (See Def.'s Mot. to Seal at
7     2.; Pl.'s Mot. to Seal at 1.) Within this category are Exhibits
8     D and K to the Hudson Declaration which consist of Darigold's
9     disability accommodations and policies. These policies are key
10    pieces of evidence in this case that are relied on by both
11    parties, and the court cannot conclude that they contain
12    confidential and proprietary business information which outweigh
13    the public policies favoring disclosure. See Kamakana, 447 F.3d
14    at 1178.

15          The parties also seek to seal several documents because
16    they allegedly "contain confidential and proprietary business
17    information" regarding Darigold's butter churn operations that
18    "could harm its competitive and business interests if widely
19    disclosed to the public." (See Def.'s Mot. to Seal at 2.) The
20    documents that the parties have identified as falling within this
21    category are Exhibit E to the Hudson Declaration, Exhibits 10 and
22    14 to the Jones Declaration, and Exhibit B to the Supplemental
23    Hudson Declaration. Exhibit 10 contains defendant's Standard
24    Operating Procedures for "Churn 1 Setup from Lactic to Unsalted
25    or Salted Butter". The other exhibits, which appear identical,
26    consist of a series of photographs of defendant's butter churn
27    equipment setup and employees following various steps of
28    defendant's processes to produce butter. Based on the

information provided, the parties have failed to demonstrate
compelling reasons to seal the exhibits at issue in their
entirety.  Further, sealing this information may prevent the
public from understanding the basis upon which the court makes
its decisions, and the parties fail to explain how the harm
outweighs public policies favoring disclosure.  See Kamakana, 447
F.3d at 1178-79.

Defendant additionally argues that Exhibits 2-5, 8, 12-
13, 15, 17-18, 21-22, and 28 of the Jones Declaration should be
sealed because they contain plaintiff's medical records and
sensitive health information.  (See Def.'s Mot. to Seal at 2.)
However, plaintiff did not designate these files as confidential,
nor has plaintiff responded to or joined the request to seal.
Moreover, plaintiff's briefing and exhibits included in their
motion for summary judgment and opposition contain no requests to
seal or redactions despite disclosing what might otherwise be
protected health information.  In other words, plaintiff appears
to have no objection to the disclosure of the information
defendant seeks to seal, which consists of plaintiff's own health
information.  Moreover, many of the documents that defendant
seeks to seal under the rationale of protecting plaintiff's
confidential health information do not appear to contain any
confidential health information. (See Jones Decl. at Exs. 22,
28.)

Under these circumstances, neither party has
articulated compelling reasons to overcome the strong presumption
in favor of public access.  See Kamakana, 447 F.3d at 1178.
However, the court notes that there is some personal information

1   in the exhibits, such as plaintiff's address, phone number, and

2   medical record numbers, which may merit protection.

3           IT IS THEREFORE ORDERED that defendant's Motion for

4   Summary Judgment (Docket No. 34), be and hereby is, GRANTED on

5   plaintiff's second claim that defendant violated the ADA and IHRA

6   by requiring him to undergo two medical examinations.

7   Defendant's Motion for Summary Judgment is DENIED in all other

8   respects. Plaintiff's Motion for Partial Summary Judgment (Docket

9   No. 37), is DENIED in its entirety.

10          IT IS FURTHER ORDERED that defendant's Motion to File

11  Documents under Seal (Docket No. 35) and plaintiff's Motion to

12  File Documents under Seal (Docket No. 38) be, and the same hereby

13  are, DENIED WITHOUT PREJUDICE.  Within ten days from the date of

14  this Order, the parties shall each file a revised request to seal

15  which complies with Idaho Local Rule 5.3 and Kamakana, 447 F.3d

16  at 1178.  The court may also consider a more tailored request,

17  such as redacting portions of the Standard Operating Procedures

18  or photographs that allegedly contain confidential and

19  proprietary business information, if such a request protects the

20  public's interest in disclosure without disclosing defendant's

21  confidential and proprietary business information.

22  Dated:  August 11, 2021

23                              WILLIAM B. SHUBB
                                UNITED STATES DISTRICT JUDGE

24

25

26

27

28